# **EXHIBIT A**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

-------------------------------------------------------------------x

XYZ TWO WAY RADIO SERVICE, INC. and
ELITE LIMOUSINE PLUS, INC.,

                           Plaintiffs,

        - against -

UBER TECHNOLOGIES, INC., WEITER, LLC,
HINTER, LLC, GRUN, LLC,
UNTER, LLC, SCHMECKEN, LLC, and
DANACH-NY, LLC,

                           Defendants.

-------------------------------------------------------------------x

Index No.: _____

Date Purchased: April 15, 2015

**SUMMONS**

Basis of Venue: Plaintiff's Residence

**TO THE ABOVE NAMED DEFENDANTS:**

      YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer on the Plaintiffs' attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: April 15, 2015
      New York, New York

                        Respectfully submitted,

                        ARKIN SOLBAKKEN LLP

                        By: _____

                            Lisa C. S. Solbakken, Esq.
                            Robert C. Angelillo, Esq.
                            Deana Davidian, Esq.
                            590 Madison Avenue, 35th Floor
                            New York, New York 10022
                            Telephone: (212) 333-0200
                            Facsimile: (212) 333-2350

                        *Attorneys for Plaintiffs*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

-------------------------------------------------------------x

XYZ TWO WAY RADIO SERVICE, INC. and       :
ELITE LIMOUSINE PLUS, INC.,                :
                                           :       Index No.: _____
                           Plaintiffs,     :
                                           :       **COMPLAINT**
         - against -                       :
                                           :
UBER TECHNOLOGIES, INC., WEITER, LLC,      :
HINTER, LLC, GRUN, LLC,                    :
UNTER, LLC, SCHMECKEN, LLC, and            :
DANACH-NY, LLC,                            :
                                           :
                           Defendants.     :

-------------------------------------------------------------x

Plaintiffs XYZ Two Way Radio Service, Inc. ("XYZ") and Elite Limousine Plus, Inc.

("Elite"), by and through their attorneys Arkin Solbakken LLP, as and for their Complaint

against Defendants Uber Technologies, Inc. ("Uber"), Weiter, LLC, Hinter, LLC, Grun, LLC,

Unter, LLC, Schmecken, LLC and Danach-NY, LLC (collectively, without Uber, the "LLC

Defendants," and with Uber, the "Defendants") allege as follows:

## NATURE OF THE ACTION

1.       Though it claims to be a technology company, Defendant Uber is known

throughout the world for operating a ground transportation service.  Uber is likewise known for

invading local markets while either ignoring or upending the safety and regulatory schemes to

which its competitors are strictly held.

2.       Industry efforts to hold Uber accountable for its conduct typically collide with its

apparently unlimited political and economic resources, all of which are directed at justifying

and/or obfuscating Uber's deviance from the mandates of the jurisdictions in which it operates.

This is complemented by Uber's media campaigns, each designed to cast itself as a victim of lazy competitors who look to begrudge Uber of its technological innovation.

3.     Uber's narrative is a fictional one.  The transportation industry is like any other, and should require that its participants compete legally and fairly, in compliance with the rules and regulations to which all like local businesses are held.

4.     Uber is not entitled to deceive consumers into believing that it affords "industry-leading" safety measures when (i) the protections of municipal and state regulations are applied to it with little to no rigor; (ii) Uber disclaims virtually all responsibility for any acts or omissions that ultimately prove "unsafe, offensive, harmful to minors, or otherwise objectionable" on the part of its drivers; and (iii) Uber ultimately leaves it up to the passenger to determine, in a fraction of a second, whether the driver that has responded to his or her e-hail will be safe and responsible.

5.     By this action, Plaintiffs, responsible black car bases with long and proud histories in the ground transportation industry in New York City, seek an order from the Court enjoining Defendants from continuing their operations in a deceptive manner and in violation of rules and regulations designed to protect public safety.

## PARTIES

6.     Plaintiff XYZ is a New York corporation with its principal place of business located at 275 20th Street, Brooklyn, New York 11215.

7.     XYZ is a black car base as that term is defined under the rules of the New York City Taxicab & Limousine Commission ("TLC").  XYZ dispatches black cars on a pre-arranged basis from its location in Brooklyn.

8.     Plaintiff Elite is a New York corporation with its principal place of business

located at 32-72 Gale Avenue, Long Island City, New York 11101.

9.      Elite is a black car base as that term is defined under TLC's rules.  Elite dispatches black cars on a pre-arranged basis from its location in Long Island City.

10.     Upon information and belief, Defendant Uber is a Delaware corporation with a principal place of business in San Francisco, California.

11.     Uber provides for-hire ground transportation services in New York City and neighboring communities through the LLC Defendants, which are New York limited liability companies that purport to share a principal place of business at 27-55 Jackson Avenue, Long Island City, New York.

12.     Defendants Weiter, LLC, Hinter, LLC, Grun, LLC, Schmecken, LLC and Danach-NY, LLC purport to be black car bases, and Defendant Unter, LLC purports to be a luxury limousine base as these terms are defined under TLC's rules.

13.     Upon information and belief, notwithstanding the foregoing, the alleged "separateness" of the LLC Defendants is fictitious and all of the LLC Defendants are owned and/or controlled by Defendant Uber.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to CPLR §§ 301 and 302.

15.     Venue in the County of Kings is proper pursuant to CPLR § 503.

## FACTUAL BACKGROUND

### I.      THE TLC

16.     Pursuant to Chapter 65 of the New York City Charter, the TLC is the administrative agency responsible for formulating, proposing, promulgating, and enforcing the rules governing vehicles that are available for-hire in New York City.

17.     In particular, the TLC establishes the procedures, rules and requirements for

3

obtaining and maintaining a license to operate a base that dispatches such vehicles.  It also sets the procedures, rules and requirements for obtaining a license to drive such vehicles.  The TLC is authorized to impose penalties for violations of its rules.

18.     The TLC's rules are designed to protect consumers, ensure public safety, safeguard competition, afford transparency to market participants, reduce traffic and pollution, and provide non-discriminatory ground transportation services to consumers in New York City.

19.     Indeed, according to TLC's website, the agency makes policy decisions "based solely on what is best for the public [it] serves."

20.     Ground transportation companies operating in New York City must abide by TLC's rules.  They have invested significant capital and resources to develop systems and infrastructure that ensures regulatory compliance and provides adequate consumer protections.

## II.     MEDALLION TAXIS ARE DISTINCT FROM BLACK CARS

21.     There are two basic categories of vehicles that are available for-hire in New York City:  (i) yellow medallion taxis; and (ii) non-medallion for-hire vehicles, including black cars, luxury limousines, and livery vehicles (black cars, luxury limousines, and livery vehicles are referred to collectively herein as "For-Hire Vehicles").[1]

22.     Yellow medallion taxis generally have the exclusive right to pick up passengers via hails in New York City.[2]  *See* N.Y.C. Admin. Code § 19-502(l) (defining a "taxi" as a "motor

---

[1]     This Complaint focuses on black cars because Plaintiffs operate black cars and nearly all of the cars that Defendants operate in New York City are black cars.  Upon information and belief, Defendants operate no livery vehicles and relatively few luxury limousines.

[2]     Yellow medallion taxis may pick up hails anywhere. Green cars (also known as "street-hail livery" vehicles, which were created in 2011 in order to service demand for street hails in the outer boroughs, and which are not required to have medallions) are prohibited from picking up hails in Manhattan south of East 96th Street or West 110th Street or at the airports but may pick up hails outside these excluded zones. N.Y. Tax L. § 1280(o) (defining "HAIL vehicle" as "a for-hire vehicle . . . authorized to accept hails from prospective passengers in the streets of the city, provided that such authorization shall prohibit the pick-up of passengers by street hail at airports and by street hail or pre-arranged call in Manhattan south of east ninety-sixth street and south of west one hundred tenth street");

vehicle carrying passengers for hire in the city . . . and permitted to accept hails from passengers in the street"); Chapter 602, Laws of New York 2012, § 11 (amending Ch. 602 of Laws of New York 2011) ("it shall remain the exclusive right of existing and future [yellow medallion] taxicabs licensed by the TLC as a [yellow medallion] taxicab to pick up passengers via street hail" in Manhattan south of East 96th Street or West 110th Street or at the airports).

23.     In exchange for the exclusive right to pick up hails in New York City, yellow medallion taxis are subject to unique requirements that do not apply to black cars (and other For-Hire Vehicles). Most importantly, the owners of taxis must purchase or lease a medallion, which is a metal plate issued by the TLC that is affixed to the hood of a taxi and displays its license number.[3] Because New York City issues a limited number of medallions, they are very valuable (and expensive) and can only be purchased at auction at specific times.

24.     Black cars perform an entirely different function than yellow medallion taxis and have their own set of specific TLC rules.

25.     In particular, black cars must be dispatched through their affiliated base station on

---

35 RCNY § 82-13 ("A Street Hail Livery Licensee must ensure that the Driver of the Street Hail Livery accepts passengers by hail from the street only in the Hail Zone."); *id.* § 51-03 ("Hail Zone is the area in which Street Hail Liveries are permitted to accept passengers by hail in the street. The Hail Zone is all areas of New York City except: (1) Manhattan south of East 96th St. and West 110th St. (2) The New York City Airports.").

[3]     In addition to the medallion requirement, yellow medallion taxis are subject to other requirements, including but not limited to: (i) taxi drivers may charge passengers only the rates set by the TLC (35 RCNY § 58-26); (ii) taxis must be one of the few vehicle models that are approved by the TLC (35 RCNY §§ 67-04 to 67-06); (iii) taxis must comply with the TLC's requirements for a variety of features, including paint, finish, lighting, upholstery, seats, windows, air conditioner, and roof lights (35 RCNY §§ 67-06 to 67-17); (iv) taxis must be equipped with taximeters, partitions, in-vehicle camera systems, credential holders, and "T-PEP" taxicab technology systems, all of which must comply with TLC specifications (35 RCNY §§ 67-09 to 67-15); (v) taxis must be retired from service after specified lengths of time as short as three years (35 RCNY § 67-18); (vi) taxi drivers must have a Taxicab Driver's License, which, among other prerequisites, requires completion of the 80-hour Authorized Taxicab Training course (35 RCNY § 54-04); (vii) taxi drivers must collect and make available to the TLC through the T-PEP system detailed trip records, including locations, times, number of passengers, and method of payment (35 RCNY § 58-22); (viii) taxi drivers pay must pay a Taxi Accessibility Fee set by the TLC (35 RCNY § 58-16(f), a Taxi Taxicab Improvement Surcharge of thirty cents per trip to subsidize taxicab accessibility (35 RCNY § 58-16(f), and an MTA Tax of fifty cents per tip to fund the Metropolitan Transportation Authority's operations (35 RCNY §§ 58-03(x), 58-26(a)(3))); and (ix) half of all taxis must be accessible to people with disabilities (35 RCNY § 58-50).

a pre-arranged basis, with passenger pick-up scheduled for a specific place and time in the future. They are strictly prohibited from picking up hails anywhere in New York City. *See* Chapter 602, Laws of New York 2012, § 11 (amending Ch. 602 of Laws of New York 2011) ("No driver of any for-hire vehicle shall accept a passenger within the city of New York by means other than a pre-arrangement with a base station"); 35 RCNY § 55-19(a) (providing that black car drivers "must not solicit or pick up Passengers other than by prearrangement through a licensed Base").

26.     In other words, yellow medallion taxis are procured on a demand basis via hail, while black cars are procured on an advance reservation basis with pick-up scheduled for a specified place and time in the future.

## III.   UBER'S ILLEGAL E-HAIL SERVICE

27.     Uber provides for-hire ground transportation services in New York City and neighboring communities through the LLC Defendants, which are licensed as black car or luxury limousine bases.

28.     Defendants do not employ drivers or own, lease, or operate any commercial vehicles. Instead, Defendants intentionally seek out, recruit and entice drivers who are already affiliated with other ground transportation companies (such as Plaintiffs) to provide services for Defendants because it is cheaper than providing training, licensing, and vehicles for new drivers.

29.     Defendants claim they "partner" with drivers affiliated with other ground transportation companies (such as Plaintiffs), who make a side deal with Defendants to drive their customers while simultaneously servicing the ground transportation companies with which they are otherwise affiliated.

30.     Uber developed and licenses a mobile phone application (the "Uber App"), which enables members of the riding public to hail rides from participating drivers with the touch of a

button.

31.     In order to book transportation services via the Uber App, passengers must first download the application to a smartphone and create an account with Uber.  As part of that process, passengers place a credit card number on file with Uber.  Before using the Uber App to request transportation services, passengers must also agree to Uber's Terms and Conditions.

32.     When a passenger opens the Uber App to request transportation, the Uber App displays a map showing the precise locations of available cars and provides the approximate travel time of the closest available car to the user's location.  When a passenger requests transportation, the Uber App conveys the request to the nearest available driver who is signed in to the Uber App (and who is not already providing transportation booked via the Uber App).

33.     If the driver declines or does not accept the request within fifteen (15) seconds, the request is automatically forwarded to the next closest driver.  An Uber driver in the vicinity accepts the request and picks up the passenger.  The driver then receives a percentage of the fee paid by the driver to Uber.

34.     Critically, the Uber App does not enable a passenger to pre-arrange to be picked up at some point in the future.  Indeed, according to Uber's website, "Uber is always booked on-demand by making a request through the app," Uber "automatically connect[s] you with the closest driver to get you picked up as quickly as possible," and Uber is "[b]etter, faster, and cheaper than a taxi."

35.     The TLC's rules sensibly provide that a hail made through an electronic method (such as the Uber App) is a hail.  *See* 35 RCNY § 51-03 (defining an "E-Hail" as "a Hail made through an E-Hail application," and a "Hail" as any "request, either through verbal (audio) action such as calling out, yelling or whistling, and/or a visible physical action such as raising one's

7

hand or arm, *or through an electronic method such as an E-Hail App*") (emphasis added). Thus, a conventional hail and an e-hail are treated the same way. Whether one hails a cab by waving, yelling, whistling, or pressing a button on a mobile phone is immaterial.

36.     Nearly all of Defendants' drivers drive black cars. None of these vehicles have medallions. Nor do they meet any of the other onerous requirements for yellow medallion taxis and their drivers. In other words, Defendants have effectively created an unlicensed taxi service, which enables its drivers to pick up passengers through hails on the streets of New York City while avoiding any of the regulations that apply to taxis and their drivers.

37.     Defendants compete unfairly against Plaintiffs and other black car bases that comply with TLC's rules, which require black car bases to dispatch vehicles from their physical base location on a prearranged basis and prohibit them from picking up passengers via hails.

38.     Defendants ignore these regulations, dispatch their vehicles as quickly as taxis, and thus have a substantial (and unfair) competitive advantage over black car bases that comply with TLC's rules by refusing to participate in on on-demand dispatching system like Uber's.

## IV.    DEFENDANTS DECEIVE CONSUMERS ABOUT SAFETY MEASURES

39.     Defendants' business model depends upon convincing consumers that it is safe to ride with Uber. In order to do so, Defendants make a number of representations on Uber's webpages, in communuications with customers, and in the media in order to convey the message that they take every measure possible to ensure the safety of their passengers.

40.     In particular, under the tagline "SAFETY BY DESIGN – Going the Distance to Put People First" on Uber's "Safety" webpage (www.uber.com/safety), Defendants claim that, "Wherever you are around the world, Uber is committed to connecting you to *the safest ride on the road*" (emphasis added).

41.     Defendants further explain: "That means setting the *strictest safety standards*

*possible*, then working hard to improve them every day.  The specifics vary depending on what local governments allow, but within each city we operate, *we aim to go above and beyond local requirements to ensure your comfort and security* – and what we're doing in the US is an example of our standards around the world" (emphasis added).

42.     Under the tagline "RIDER SAFETY," Defendants claim: "From the moment you request a ride to the moment you arrive, the Uber experience has been designed from the ground up with your safety in mind."

43.     Phillip Cardenas, Uber's Head of Global Safety, represents on a blog entry linked through Uber's website:  "We believe deeply that, alongside our driver partners, we have built *the safest transportation option in 260 cities around the world*" (emphasis added).

44.     In reality, as discussed below, Defendants' representations about safety measures are materially false and misleading.

### A.     Defendants Misrepresent That They Vet Their Drivers Using An "Industry-Leading" Background Check Process

45.     On its website, under the tagline "RIDER SAFETY," Defendants introduce the centerpiece of their advertising about customer safety: "BACKGROUND CHECKS YOU CAN TRUST."

46.     Through the end of October 2014, Defendants represented to consumers that "[e]very ridesharing and livery driver is *thoroughly screened through a rigorous process we've developed using industry-leading standards*.  This includes a three-step criminal background screening for the U.S. – with county, federal and multi-state checks that go back as far as the law allows – and ongoing reviews of drivers' motor vehicle records throughout their time on Uber" (emphasis added).  In or about November 2014, Defendants changed the words "industry-leading" to "constantly improving."

47.     Through mid-December 2014, Lane Kasselman, Uber's Head of Communications for the Americas, represented on a blog entry linked through Uber's website:  "All Uber ridesharing and livery partners must go through *a rigorous background check that leads the industry* . . . Screening for safe drivers is just the beginning of our safety efforts.  Our process includes prospective and regular checks of drivers' motor vehicle records to ensure ongoing safe driving.  Unlike the taxi industry, our background checking process and standards are consistent across the United States and *often more rigorous than what is required to become a taxi driver*" (emphasis added).  In or about mid-December 2014, Defendants removed the words "that leads the industry."

48.     Kasselman further represents:  "Uber works hard to ensure that we are connecting riders with *the safest rides on the road*.  The current efforts we are undertaking to protect riders, drivers and cities are just the beginning.  We'll continue innovating, refining, and working diligently to ensure we're doing everything we can to make Uber *the safest experience on the road*'" (emphasis added).

49.     Cardenas also claims:  "Of course, no background check can predict future behavior and no technology can yet fully prevent bad actions.  *But our responsibility is to leverage every smart tool at our disposal to set the highest standard in safety we can.  We will not shy away from this task*" (emphasis added).

50.     Defendants' representations are materally false and misleading.  Viewed separately or together, Defendants' representations are likely to mislead consumers into believing that Defendants do everything they can to ensure their safety.

51.     In fact, the centerpiece of Uber's customer safety assurances – the background check process Uber describes as "industry-leading" and "more rigorous than what is required to

become a taxi driver" – does not use fingerprints or even require the applicant to appear in person.  Nor does it test applicants for abuse of drugs, or for any other medical conditions that could impair their ability to drive.

52.     Instead, Defendants simply ask applicants to submit their name, address, driver's license number, and social security number through a webpage.  Defendants then provide this information to Hirease, Inc., the private company that performs their background checks. Hirease then generates a report by searching publicly available records.

53.     Defendants' background check process is highly vulnerable to error and gives consumers little protection from drivers that may pose a threat to their safety.

54.     In particular, this process cannot ensure that the information in the background check report is actually associated with the applicant since it does not use a unique biometric identifier such as a fingerprint.  An online search by name would not reveal the criminal history of a driver who has changed his or her name (or its spelling) or is borrowing or stealing the identity of another person in order to pass the test.  Because no unique identifying information such as a fingerprint is required, Hirease posts a sample report on its website that states:  "Final verification of an individual's identity and proper use of report contents are the user's responsibility."

55.     The information in these reports is often outdated and/or incomplete, since Hirease cannot access official government databases.  Moreover, under California law, Hirease and other consumer reporting agencies can only report records from the past seven (7) years. And if a driver commits a crime after Hirease runs its report, Defendants will not be notified.

56.     Because of inaccurate and/or incomplete background check information provided by private companies such as Hirease, California's Investigative Consumer Reporting Agencies

11

Act requires those companies to include on the first page of every background check report a notice stating that "**_the report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation_**, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the customer who is the subject of the report" (emphasis added).

57. By contrast, the TLC requires drivers of yellow medallion taxis and black cars in New York City (including drivers affiliated with Plaintiffs) to meet several requirements before they can obtain a license, including but not limited to: (i) passing a drug test; (ii) providing a medical certification form signed by a doctor certifying whether the applicant is medically fit to safely operate a TLC licensed vehicle; and (iii) undergoing a criminal background check using fingerprint identification employing a technology called "LiveScan."

58. LiveScan is an electronic method of imaging and sending applicants' fingerprints to the New York State Division of Criminal Justice Services ("DCJS"), which conducts the background checks by performing a biometric search of official government databases. The DCJS then sends the results to the TLC.

59. Because of the unique identifying characteristics of fingerprints, LiveScan provides assurances that the person whose criminal history has been run is, in fact, the applicant. In other words, a convicted felon cannot use the identification information of a law-abiding citizen to become a driver. LiveScan also facilitates ongoing review of drivers' records after they obtain a license to drive from the TLC.

60. Uber's own background check provider, Hirease, explains on its website why a fingerprint-based background check process is far superior: "Fingerprinting helps uncover

criminal history not discovered through traditional methods, offers extra protection to aid in meeting industry guidelines, and helps prevent fraud."

61.     Contrary to Defendants' representations that they employ "background checks you can trust," that are "more rigorous than what is required to become a taxi driver," and that "leverage every smart tool at [their] disposal to set the highest standards in safety," Uber's background check process (i) does not test for drugs; (ii) does not test for medical conditions that could impair an applicant's ability to drive; and (iii) does not provide the level of security provided by the fingerprint-based LiveScan process employed for background checks on yellow medallion taxi and black car drivers in New York City.

62.     By championing their "industry-leading" standards for vetting drivers, Defendants give consumers a false sense of security when deciding whether to use their services.

**B.      Defendants Misrepresent That Their Drivers Meet Uber's Standards And That They Take Steps To Weed Out Unsuitable Drivers**

63.     On Uber's website, Defendants assure consumers that their "[d]rivers not only meet Uber's standards, they meet your standards."

64.     Yet, in an effort to avoid a finding that Uber's drivers are employees as opposed to independent contractors, Uber has argued in federal courts across the country that:  (i) it does not train, supervise, or evaluate its drivers; (ii) it "has no right to control, and does not control, the manner in which [they] provide transportation services"; (iii) Uber's rules for drivers are simply "suggestions"; (iv) "Uber has no authority to dictate compliance with these suggestions and takes no steps to determine whether drivers accept or reject them"; (v) Uber drivers are "free to accept or reject [Uber's] suggestions without repercussions"; and (vi) drivers' accounts "are *not* deactivated for failure to comply with any particular suggestions or any particular instance of reported low-quality service."  In fact, Uber concedes its drivers "could go years without setting

13

foot in Uber's offices and ha[ve] very limited contact with Uber." *See O'Connor v. Uber*

*Technologies, Inc.*, Case No. 13-cv-03826 (N.D. Cal.), Dkt Nos. 211, 213 & 227 (quoting Uber's

Mem. in Supp. of Mot. for Summary Judgment dated December 4, 2014, Decl. of Michael

Colman in Supp. of Mot. for Summary Judgment dated December 4, 2014, and Reply in Supp. of

Mot. for Summary Judgment dated January 9, 2015).

      65.     Nonetheless, Defendants claim to consumers that, despite their failure to monitor

driver's performance, they take steps to weed out unsuitable drivers:

> At Uber, riders rate their experience at the end of every trip, and drivers do the
> same. Uber regularly reviews that feedback and, though this process, we're able
> to create a maintain a safe and respectful environment for riders . . . Real-time
> feedback about drivers means Uber can correct for issues big and small – while
> ensuring that only the best drivers stay on the road. We take this feedback
> seriously – depending on the circumstances, rider feedback may lead to
> deactivating a partner from the system . . . .

      66.     Defendants' only insight into the quality of service provided by drivers comes

from passengers, in the form of a five-star "rating system" by which customers can choose to

rate their driver's services immediately after their ride.

      67.     Defendants claim that, if a driver falls below a certain star rating, they will

"deactivat[e] a partner from the system."

      68.     But Defendants fail to disclose to their customers that every driver receives a five

star rating just for signing up with Uber, and falls below a five star rating only if dissatisfied

customers take the time to post negative reviews.

      69.     Moreover, upon information and belief, Defendants continue to use drivers even

after they have received multiple negative reviews.

14

C.      **Defendants Misrepresent That Their Drivers Are**
        **"Partners" And That Uber "Has Their Backs"**

70.      Defendants entice both passengers and drivers to join their service by falsely claiming that there is a partnership between Defendants and their drivers. Indeed, Uber's website repeatedly refers to drivers as "Partners," "Driver Partners" and "Partner Drivers." It further declares that "Uber partners with drivers," and that drivers are "our partners." Uber advises prospective drivers that "[w]hen you partner with Uber, we've got your back." Further, on its website, Uber quotes a driver who claims that "partnering" with Uber is a "safer alternative to taxis."

71.      Defendants further claim that "all UberBLACK, Uber SUV, or uberTAXI rides are provided by commercially licensed and insured partners and drivers."

72.      This is deceptive; Uber is not "partners" with these drivers. Nor does it commit itself to any liability resulting from "its" drivers or their vehicles.

73.      To the contrary, under Uber's fine print Terms and Conditions of service – which passengers must "click through" at the outset of downloading the Uber App to their phone – drivers are labeled as "third party transportation providers," and Defendants disclaim virtually all responsibility for their conduct:

>        UBER'S SERVICES MAY BE USED BY YOU TO REQUEST AND
>        SCHEDULE TRANSPORTATION OR LOGISTICS SERVICES WITH **THIRD**
>        **PARTY PROVIDERS**, BUT YOU AGREE THAT UBER HAS NO
>        RESPONSIBILITY OR LIABILITY TO YOU RELATED TO ANY
>        TRANSPORTATION OR LOGISTICS PROVIDED TO YOU BY THIRD
>        PARTY PROVIDERS THROUGH THE USE OF THE SERVICES OTHER
>        THAN AS EXPRESSLY SET FORTH IN THESE TERMS.
>
>        **UBER DOES NOT GUARANTEE THE SUITABILITY, SAFETY OR**
>        **ABILITY OF THIRD PARTY PROVIDERS**. IT IS SOLELY YOUR
>        RESPONSIBILITY TO DETERMINE IF A THIRD PARTY PROVIDER WILL
>        MEET YOUR NEEDS AND EXPECTATIONS. UBER WILL NOT
>        PARTICIPATE IN DISPUTES BETWEEN YOU AND A THIRD PARTY

PROVIDER.  BY USING THE SERVICES, **YOU ACKNOWLEDGE THAT YOU MAY BE EXPOSED TO SITUATIONS INVOLVING THIRD PARTY PROVIDERS THAT ARE POTENTIALLY UNSAFE, OFFENSIVE, HARMFUL TO MINORS, OR OTHERWISE OBJECTIONABLE,** AND THAT USE OF THIRD PARTY PROVIDERS ARRANGED OR SCHEDULED USING THE SERVICES IS AT YOUR OWN RISK AND JUDGMENT.  **UBER SHALL NOT HAVE ANY LIABILITY ARISING FROM OR IN ANY WAY RELATED TO YOUR TRANSACTIONS OR RELATIONSHIP WITH THIRD PARTY PROVIDERS.**

(emphasis added).

74.     Thus, while Defendants hold themselves out to the public as a safe operation that "partners" with their drivers, Defendants disclaim virtually all responsibility – including any acts or omissions that ultimately prove "***unsafe, offensive, harmful to minors, or otherwise objectionable***" on the part of their drivers.

75.     Instead, Defendants require that the customers themselves determine on their own whether a driver is safe and responsible before they even ride with that driver.

76.     If consumers knew and understood that Defendants actually disavowed control and/or responsibility for the "suitability, safety or ability" of their drivers and vehicles, those passengers would have foregone and would likely forego arranging for transportation through Defendants and instead use ground transportation services provided by Plaintiffs.

77.     Defendants' conduct is completely contrary to their numerous advertisements about the quality and safety of their services, and creates a clear and present danger to the safety and well-being of New Yorkers.

### D.     Defendants Threaten Public Safety By Requring Drivers To Use Their Mobile Phones While Driving In Violation Of The Law

78.     In fact, Defendants' entire business model is premised upon conduct that poses a threat to the safety and well-being of New Yorkers.

79.     Defendants require their drivers to use mobile phones while operating their

16

vehicles to receive and accept assignments through Uber, arrange pick-ups, and otherwise communicate with passengers.

80.     To receive pick-up requests, a driver must log in to Uber's technology platform via the internet using a mobile phone.  The driver's mobile phone relays the driver's location using a Global Positioning System ("GPS") and signals to Uber's network that the driver is available to accept requests for Uber rides.

81.     Once an e-hail is made, Uber drivers typically are given fifteen (15) seconds to respond to an assignment or they will lose the job to another driver, increasing stress, distraction, and the potential for accidents.  Upon information and belief, a driver who fails to respond to several incoming assignments is subject to suspension by Uber – regardless of conditions on the road that may make responding at that moment dangerous.

82.     If an Uber driver accepts the pick-up request, the driver's telephone number is sent to the customer, along with an estimated time of arrival.  Defendants encourage customers to call or text the driver if they need to, and require drivers to call or text the customer when the car is close to the pick-up point.

83.     Defendants' business model encourages Uber drivers to ignore the task at hand, *i.e. driving their vehicle*, and instead to focus on their mobile phones as they desperately seek the next fare in competition with their fellow Uber drivers.

84.     New York's Vehicle & Traffic Law and TLC's rules prohibits drivers from operating a vehicle while using a portable electronic device.  *See* N.Y. VTL 1225-c & 1115-d; 35 RCNY § 55-14(g).

85.     Whereas calling, texting or engaging in other distracting activities while driving can subject ordinary citizens to monetary penalties under the VTL, these activities are not only

17

encouraged among Uber drivers, but are necessary for drivers to be competitive, as each driver in the area is essentially competing for each incoming request.

86. Of course, the inherent danger to both the drivers and the public in this arrangement is clear and undeniable as it establishes a pack of predatory drivers racing to win fares with their eyes on their phones instead of the road.

87. Contrary to Defendants' representations that Uber offers "the safest ride on the road," Defendants' business model diverts drivers' attention from the road – exposing drivers, passengers, and pedestrians to great risk of harm.

## V. DEFENDANTS' FALSELY IMPLY THAT THEY ARE ASSOCIATED WITH, SPONSORED, OR APPROVED BY PLAINTIFFS

88. Defendants' representations and business practices are likely to cause confusion, mistake, or deception as to whether Plaintiffs are associated with, affiliated with, or connected to Uber, or as to whether Plaintiffs sponsor, approve, or endorse Uber.

89. XYZ's vehicles bear a sticker with XYZ's service mark (consisting of XYZ's name, logo, and design) affixed to the left outside corner of the rear window; a sign with XYZ's service mark and the driver's XYZ "radio" number on the left side of the back of the vehicle; and XYZ's name on several places on the license plate. These features identify vehicles as being owned and/or operated by XYZ.

90. Elite's vehicles bear Elite's name and the driver's Elite franchise number on the license plate. These features identify the vehicles as being owned and/or operated by Elite.

91. When a car with Plaintiffs' service marks and other identifying features arrives at the pick-up location as the Uber assigned black car in response to an Uber customer's request and places a sign bearing Uber's name, logo and colors in its window, consumers are likely to believe Plaintiffs are affiliated or associated with Uber and/or that Plaintiffs sponsor or partner

18

with Uber.

92.     To add to the confusion, Uber's website repeatedly refers to drivers as "Partners," "Driver Partners" and "Partner Drivers."  It further declares that "Uber partners with drivers," and that drivers are "our partners."

93.     By this conduct, Defendants promote the false impression to consumers that when Plaintiffs' vehicles respond to an Uber dispatch call, Plaintiffs are working with Uber.

94.     Plaintiffs' reputation and good will is damaged by this likelihood of confusion. Indeed, consumers are likely to associate Plaintiffs and their marks with Uber in a manner that detracts from the safety, reliability and assurances offered when a customer arranges a pick-up through Plaintiffs.

## VI.    DEFENDANTS TORTIOUSLY INTERFERE WITH THE CONTRACTUAL RELATIONS BETWEEN XYZ AND ITS DRIVERS

95.     XYZ's drivers are subject to XYZ's Bylaws, rules, regulations, policies and procedures, which together constitute a valid and binding contract between XYZ and each of its drivers.  As discussed below, Defendants intentionally and knowingly encourage XYZ's drivers who join Uber's service to breach those agreements.

### A.    Defendants Encourage Drivers To Provide Services To, Or Affiliate Themselves With, Uber In Breach Of The Drivers' Contracts With XYZ

96.     XYZ's contracts with its drivers prohibit drivers from performing services for other companies that compete with XYZ in the New York ground transportation market.

97.     For example, XYZ's Bylaws expressly prohibit those drivers who are also shareholders (as many of its drivers are) from "affiliating in any manner with other ground transportation companies in the New York Metropolitan area, be it as an owner, partner, member, officer, director, shareholder, employee, independent contractor or consultant."  Bylaws Art. II § 14.3.

19

98.    XYZ's drivers also sign contracts with XYZ, which provide that "[a]ll XYZ affiliate drivers [are] prohibited [from] work[ing] for [any] other company at the same time," and that "[a]ll XYZ Members are <u>PROHIBITED</u> [from] servic[ing] other companies while registered with XYZ" (emphasis in original).

99.    Upon information and belief, Defendants know that XYZ's drivers are parties to contracts with XYZ that prohibit them from providing services to, or otherwise affiliating themselves with, Defendants.

100.    Nonetheless, Defendants intentionally seek out, recruit and entice XYZ's drivers to provide services for Defendants because it is cheaper than providing training, licensing, and vehicles for new drivers.

101.    Defendants are able to entice drivers to join their service because, among other things, (i) Defendants offer "surge" pricing and other benefits that are not available to traditional providers such as XYZ, who are bound by and adhere to TLC's rules prohibiting such activities; (ii) Defendants make material misrepresentations concerning their "partnership" with Uber drivers; (iii) Defendants create the illusion that their services are superior (in terms of quality, safety, and/or other metrics) to those offered by Plaintiffs, when in fact they are not; and (iv) driving for Uber is easier and cheaper than driving for traditional providers such as XYZ, who comply with TLC's rules regarding licensing, inspections, and street hails.

102.    As a result of Defendants' conduct, XYZ has lost several drivers, either because those drivers have severed their relationships with XYZ (or were terminated for non-compliance with their contractual obligations), or because the drivers' improper affiliations with Defendants have rendered them unavailable to drive XYZ's customers.

103.    Defendants' wrongful interference has rendered XYZ unable to fulfill customer

requests, resulting in a substantial loss of sales and profits, together with irreparable harm to XYZ's customer relationships, reputation and goodwill.

**B.    Defendants Require Drivers To Violate Applicable Rules
And Regulations In Breach Of The Drivers' Contracts With XYZ**

104.    XYZ's contracts with its drivers also require drivers to comply with all applicable rules and regulations, including TLC's rules and the VTL.  Because XYZ faces fines, suspension or revocation of the right to do business, and/or other penalties if its drivers fail to abide by these rules and regulations, XYZ has a strong incentive to ensure that its drivers comply with same.

105.    Upon information and belief, Defendants know that XYZ's drivers are parties to contracts with XYZ that require them to abide by applicable rules and regulations, and that XYZ faces penalties if its drivers fail to do so.

106.    Nonetheless, Defendants' business model requires drivers to violate applicable rules and regulations in several respects.

107.    *First*, Defendants connect drivers to passengers though a computer system that is independent of the licensed black car base stations through which they operate in New York City.  Defendants therefore cause drivers to violate TLC's rules requiring black cars to be dispatched "through" and "from" the "physical location" of their affiliated base station.  *See* 35 RCNY § 55-03(h) (providing, for all for-hire vehicles, that a black car's base station "is the Commission-licensed business for dispatching For-Hire Vehicles and the physical location from which For-Hire Vehicles are dispatched"); *id.* § 59A-03(e) (same); *id.* § 59B-03(f) (same); *id.* § 59A-03(c) (providing that a black car base station must be the "central dispatch facility"); *id.* § 59B-03(c)(same); *id.* § 55-19(a) (proving that black car pre-arrangements must be made "through a licensed Base"); *id.* § 59A-11(e)(3) (emphasizing with *italics* that a black car must be "dispatched *from* its affiliated Base") (emphasis in original); *id.* § 59B-15(a) (providing that a

21

black car base station "must maintain a principal place of business in a commercially zoned area, from which affiliated Vehicles and Drivers can be dispatched"); *id.* § 59B-15(d) (providing that "no For-Hire Vehicle can be dispatched from any location other than the location specified in the Base License").

108.   *Second*, Defendants require drivers to pick-up passengers through e-hails in violation of the TLC's rules, which prohibit black cars from picking up hails anywhere in New York City.  *See* Chapter 602, Laws of New York 2012, § 11 (amending Ch. 602 of Laws of New York 2011) ("No driver of any for-hire vehicle shall accept a passenger within the city of New York by means other than a pre-arrangement with a base station . . . ."); 35 RCNY § 55-19(a) (providing that black car drivers "must not solicit or pick up Passengers other than by prearrangement through a licensed Base").  By doing so, Defendants transform black cars affiliated with XYZ into illegal unlicensed taxicabs.

109.   *Third*, Defendants require their drivers to use mobile phones while operating their vehicles to receive and accept assignments from Uber, arrange pick-ups, and communicate with passengers.  This is in violation of the VTL and TLC's rules, which prohibit drivers from operating a vehicle while using a portable electronic device.  *See* N.Y. VTL 1225-c & 1115-d; 35 RCNY § 55-14(g).  It also increases the potential for accidents involving drivers and black cars affiliated with XYZ.

110.   *Fourth*, Defendants require drivers to exploit consumers by imposing "surge pricing" to double or triple rates during periods of high demand or emergency.  This is in violation of TLC's rules, which prohibit drivers from charging fares above the pre-approved rates quoted by the base station with which they are affiliated.  *See* RCNY 35 § 55-15(g).

22

111.    *Fifth*, Defendants violate TLC's rules requiring that all black cars must be owned either by a franchisee or by a member of a cooperative that operates the base station.  *See* 35 RCNY §§ 55-03(d)(2), 59A-03(c)(2), 59B-03(c)(2), 59B-08(b).  Uber's drivers are neither franchisees nor cooperative members.

112.    *Finally*, Defendants allow drivers complete discretion to decide whether to pick up a particular passenger.  That exercise of discretion may be informed by ratings the passenger previously received from other drivers.  Uber's rating system invites drivers to violate 35 RCNY § 55-20, which prohibits drivers from refusing to pick up passengers except under narrowly prescribed circumstances.  The prospect of denial of service based on an individual's political beliefs, age, race, ethnic origin, sexual orientation, neighborhood of residence, need for additional assistance or other protected characteristic is undeniable.

113.    By inducing drivers to violate TLC's rules and the VTL, Defendants tortiously interfere with the drivers' contracts with XYZ.  XYZ stands to incur fines, suspension or revocation of the right to do business, and/or other penalties as a result.

## VII.    DEFENDANTS' HISTORY OF NON-COMPLIANCE WITH TLC'S RULES

114.    Since Uber began operating in New York City, it has repeatedly violated TLC's rules.  In fact, when Uber first entered the New York City market, it took the strained position that it was not subject to TLC's jurisdiction and did not need to operate through licensed drivers or through licensed base stations.

115.    After it reluctantly agreed to operate through licensed base stations, Defendants then refused to release trip data to the TLC in violation of its rules.  *See* 35 RCNY § 59B-19(a).

116.    On January 6, 2015, the TLC suspended the licenses of five LLC Defendants for failing to disclose trip data:  Weiter, LLC, Hinter, LLC, Schmecken, LLC, Danach-NY, LLC, and Unter, LLC.  This left only Defendant Grun, LLC as a licensed and operating "base."

117.     Shortly after the suspension, Uber issued a notice to all of its drivers indicating that the suspension of Hinter, LLC (one of the suspended bases) in no way affects Uber's business operations.  It further stated that trips would instead simply be provided by Grun, LLC, another Uber-affiliated base.  This was in violation of TLC's rules, which prohibit the dispatching of a vehicle affiliated with a suspended base.

118.     Defendants simply ignored the fact that Unter, LLC, which purports to be a luxury limousine base, continued to service its customers through Grun, LLC, which purports to be a black car base.  This was in violation of TLC's rules which, at that time, prohibited a vehicle affiliated with a luxury limousine base from being dispatched by a black car base.

119.     Finally, notwithstanding the suspensions, at least one LLC Defendant – Danach-NY, LLC – simply continued to operate notwithstanding the fact that it was suspended.

120.     Not surprisingly, a TLC spokesperson stated that Uber was denied a license to operate a seventh base in New York City because "they are unfit to hold an additional license based on [a] history of non-compliance with respect to other base licenses they hold."

## VIII.   PLAINTIFFS ARE HARMED BY DEFENDANTS' DECEPTIVE AND ILLEGAL CONDUCT

121.     Defendants' deceptive acts and practices are intended to, and in fact do, lure customers and drivers away from competitors such as Plaintiffs, by creating the illusion that Defendants' services are superior (in terms of quality, safety, and/or other metrics) to those offered by Plaintiffs, when in fact they are not.

122.     Because Plaintiffs' main source of operating revenue is derived from fares paid by customers to Plaintiffs' drivers, the loss of customers and drivers to Defendants resulting from Defendants' deceptive acts and practices has caused and will cause Plaintiffs to lose substantial revenue.

24

123.    Moreover, Defendants' deceptive acts and practices permit them to compete unfairly against Plaintiffs because Defendants (unlike Plaintiffs) do not incur the substantial costs of adhering to TLC's rules regarding safety, licensing, price, and other matters.  Those savings in turn allow Defendants to offer lower fares and/or higher wages than they would otherwise be able to sustain, attract additional capital, and invest more resources in expanding their market share, causing further harm to Plaintiffs.

124.    Plaintiffs have been losing drivers at an alarming rate, either because those drivers have severed their relationships with Plaintiffs in order to drive for Defendants (or have been terminated because they provided services to Defendants in breach of their contractual obligations), or because the drivers' improper affiliations with Defendants have rendered them unavailable to drive Plaintiffs' customers.

125.    Defendants' wrongful interference has rendered Plaintiffs unable to fulfill customer requests, resulting in a substantial loss of sales and profits, together with irreparable harm to Plaintiffs' customer relationships, reputation and goodwill.

126.    Finally, Defendants and their drivers use the infrastructure established by Plaintiffs, while increasing their potential liability.  By inducing drivers to violate applicable rules and regulations and requiring drivers to use mobile phones while operating their vehicles, Defendants place Plaintiffs in danger of increased liability and loss of their operating licenses.

127.    Defendants' conduct also places the drivers associated with Plaintiffs at risk of losing their licenses because every Uber ride is in violation of applicable rules and regulations.

## CAUSES OF ACTION

## COUNT ONE
### (GBL § 349)

128.    Plaintiffs repeat and re-allege each and every allegation set forth in the preceding paragraphs as if the same were fully set forth herein.

129.    Plaintiffs have been injured and suffered damages by violations of New York General Business Law ("GBL") § 349(a), which states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

130.    Defendants have engaged in consumer-oriented acts and practices in the State of New York that are deceptive or misleading in a material way.  Such acts and practices are likely to mislead a reasonable consumer acting reasonably under the circumstances.

131.    Defendants' deceptive acts and practices include:

- Misleading consumers about their safety measures, including but not limited to the quality of their background checks, the quality of their drivers, and steps they take to weed out unsuitable drivers.

- Misrepresenting that their drivers are "partners" and that Defendants "have their backs," when in reality they are "third party providers" and Defendants disclaim virtually all responsibility for them.

- Misleading customers to believe that Plaintiffs are affiliated with or otherwise sponsor, approve of, or endorse Uber.

132.    Defendants' deceptive acts and practices have a broad impact on the public at large, as they are disseminated to the public via Uber's website, the Uber App, state-wide advertising and promotions, and other public statements aimed at consumers throughout the State of New York.

133.    Defendants' conduct is not only deceptive to consumers, it creates a clear and

present danger to the health and safety of Defendants' passengers and drivers, as well as the public at large.

134.    Plaintiffs are business competitors of Defendants, and Plaintiffs have been damaged by Defendants' violations of GBL § 349.

135.    Pursuant to GBL § 349(h), Plaintiffs are entitled to an injunction enjoining Defendants' wrongful acts and practices that violate GBL § 349, monetary damages in an amount to be proven at trial as a result of Defendants' willful and wrongful violations of GBL § 349, and an award of reasonable attorneys' fees and costs.

**COUNT TWO**
**(GBL §§ 350 and 350-a)**

136.    Plaintiffs repeat and re-allege each and every allegation set forth in the preceding paragraphs as if the same were fully set forth herein.

137.    Plaintiffs have been injured and suffered damages by violations of GBL § 350, which states: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful," and GBL § 350-a, which states: "The term 'false advertising' means advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity . . . to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual."

138.    Defendants have engaged in consumer-oriented acts and practices in the State of New York, including false advertising, that are deceptive or misleading in a material way.  Such

acts and practices are likely to mislead a reasonable consumer acting reasonably under the circumstances.

139.    Defendants' deceptive acts and practices include:

- Misleading consumers about their safety measures, including but not limited to the quality of their background checks, the quality of their drivers, and steps they take to weed out unsuitable drivers.

- Misrepresenting that their drivers are "partners" and that Defendants "have their backs," when in reality they are "third party providers" and Defendants disclaim virtually all responsibility for them.

- Misleading customers to believe that Plaintiffs are affiliated with or otherwise sponsor, approve of, or endorse Uber.

140.    Defendants' deceptive acts and practices, including false advertising, have a broad impact on the public at large, as they are disseminated to the public via Uber's website, the Uber App, state-wide advertising and promotions, and other public statements aimed at consumers throughout the State of New York.

141.    Defendants' conduct is not only deceptive to consumers, it creates a clear and present danger to the health and safety of Defendants' passengers and drivers, as well as the public at large.

142.    Plaintiffs are a business competitors of Defendants, and Plaintiffs have been damaged by Defendants' violations of GBL §§ 350 and 350-a.

143.    Pursuant to GBL § 350-e, Plaintiffs are entitled to an injunction enjoining Defendants' wrongful acts and practices that violate GBL §§ 350 and 350-a, monetary damages in an amount to be proven at trial as a result of Defendants' willful and wrongful violations of GBL §§ 350 and 350-a, and reasonable attorneys' fees and costs.

## COUNT THREE
## (Lanham Act, 15 U.S.C. § 1125(a)(1)(B))

144.    Plaintiffs repeat and re-allege each and every allegation set forth in the preceding paragraphs as if the same were fully set forth herein.

145.    Plaintiffs have been injured and suffered damages by violations of 15 U.S.C. § 1125(a)(1)(B), which states in relevant part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –
>
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

146.    In connection with the marketing and advertising of its services, Defendants employ false or misleading representations, descriptions, designations and/or devices, including the following:

- Misleading consumers about their safety measures, including but not limited to the quality of their background checks, the quality of their drivers, and steps they take to weed out unsuitable drivers.

- Misrepresenting that their drivers are "partners" and that Defendants "have their backs," when in reality they are "third party providers" and Defendants disclaim virtually all responsibility for them.

- Misleading customers to believe that Plaintiffs are affiliated with or otherwise sponsor, approve of, or endorse Uber.

147.    Defendants' deceptive practices are used in both intrastate and interstate commerce, as they are disseminated to the public via Uber's website, the Uber App, state- and nation-wide commercial advertising and promotions, and other public statements aimed at

29

consumers throughout the State of New York and the United States.

148.    Defendants' statements are literally false and/or are likely to deceive or confuse customers.

149.    Plaintiffs have been harmed by Defendants' deceptive practices.

150.    Unless enjoined by the Court, Defendants will continue to do the acts complained of herein and cause damage and injury.

151.    Pursuant to 15 U.S.C. § 1117(a), Plaintiffs seek a recovery of Defendants' profits in New York, compensatory damages for the harm suffered by Plaintiffs, and the costs of the action, together with attorneys' fees, or such other amount as the Court deems just and proper.

## COUNT FOUR
### (Lanham Act, 15 U.S.C. § 1125(a)(1)(A))

152.    Plaintiffs repeat and re-allege each and every allegation set forth in the preceding paragraphs as if the same were fully set forth herein.

153.    Plaintiffs have been injured and suffered damages by violations of 15 U.S.C. § 1125(a)(1)(A), which states in relevant part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . .
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

154.    Plaintiffs are in the business of providing public transportation services to consumers.

155.    Plaintiffs are not affiliated with, associated with, or connected to Defendants, and Plaintiffs do not approve, sponsor, or endorse Defendants or Defendants' services.

156.    Defendants have used vehicles that bear Plaintiffs' service marks and other features identify the vehicles as being owned and/or operated by Plaintiffs.

157.    Uber repeatedly refers to its drivers as "Partners," "Driver Partners" and "Partner Drivers."  It further declares that "Uber partners with drivers," and that drivers are "our partners."

158.    Defendants' representations and business practices are likely to cause confusion, mistake, or deception as to the source, affiliation, connection, or association of Defendants' services with Plaintiffs, or as to the approval, sponsorship, or endorsement of Defendants' services by Plaintiffs.

159.    Defendants willfully trade on the names and reputations of Plaintiffs.

160.    Plaintiffs have been harmed by Defendants' representations and business practices.

161.    Unless enjoined by the Court, Defendants will continue to do the acts complained of herein and cause damage and injury.

162.    Pursuant to 15 U.S.C. § 1117(a), Plaintiffs seek a recovery of Defendants' profits in New York, compensatory damages for the harm suffered by Plaintiffs, and the costs of the action, together with attorneys' fees, or such other amount as the Court deems just and proper.

<u>COUNT FIVE</u>
**(Tortious Interference with Contractual and Business Relations)**

163.    XYZ repeats and re-alleges each and every allegation set forth in the preceding paragraphs as if the same were fully set forth herein.

164.    XYZ has a business relationship with each of its drivers.

165.    There is a valid and binding contract between XYZ and each of its drivers, which consists of Bylaws, rules, regulations, policies and procedures.

166.    This contract includes, among other things, prohibitions on drivers performing services for other companies that compete with XYZ in the New York ground transportation industry, and requirements that drivers comply with applicable rules and regulations, including the TLC's rules and the VTL.

167.    Such provisions are valid and enforceable, are standard and commonplace, and are known throughout the New York ground transportation industry (including to Defendants).

168.    Upon information and belief, Defendants are aware that XYZ's drivers are subject to such contractual provisions by virtue of their affiliation with XYZ.

169.    Defendants have knowingly and intentionally induced XYZ's drivers to breach each of these contractual obligations to XYZ, and/or have interfered with XYZ's business relations with its drivers, with malice and/or by means that were dishonest, unfair and improper by (i) contracting with XYZ's drivers; and (ii) requiring them to violate applicable rules and regulations, notwithstanding the above contractual prohibitions.

170.    As a result of Defendants' wrongful interference, XYZ has been harmed and is entitled to money damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment as follows:

(i)     A permanent injunction against Defendants enjoining them from continuing their deceptive and wrongful acts and practices;

(ii)    Awarding damages on each of their claims in an amount to be proven at trial;

(iii)   Awarding attorneys' fees and costs pursuant to GBL §§ 349(h) and 350-e.3, and 15 U.S.C. § 1117(a);

(iv)    Awarding pre- and post- judgment interest at the maximum legal rate; and

(v)     Such other and further relief that the Court deems just and proper under the circumstances.

Dated: April 15, 2015
      New York, New York

                         Respectfully submitted,

                         ARKIN SOLBAKKEN LLP

                         By: _____

                               Lisa C. Solbakken, Esq.
                               Robert C. Angelillo, Esq.
                               Deana Davidian, Esq.
                               590 Madison Avenue, 35th Floor
                               New York, New York 10022
                               Telephone: (212) 333-0200
                               Facsimile: (212) 333-2350

                               *Attorneys for Plaintiffs*

33

FILED: KINGS COUNTY CLERK 04/30/2015 12:11 PM        INDEX NO. 504469/2015

NYSCEF DOC. NO. 1   Case 1:15-cv-03015-FB-CLP   Document 1-1   Filed 05/22/15   Page 36 of 42 PageID #: 40   RECEIVED NYSCEF: 04/30/2015

# AFFIDAVIT OF SERVICE

State of New York                   County of Kings                   Supreme Court

Index Number: 504469/2015
Date Filed: 4/15/2015


Plaintiff:
**XYZ Two Way Radio Service, Inc. and Elite Limousine Plus, Inc.**
vs.
Defendant:
**Uber Technologies, Inc., et al.**

**State of New York, County of Albany)ss.:**


Received by Capital Process Servers, Inc. to be served on **Uber Technologies, Inc.**.

I, R. R. Ricchiuti, being duly sworn, depose and say that on the **24th day of April, 2015** at **2:10 pm, I:**

Served Uber Technologies, Inc. by delivering two true copies of the **Notice of Commencement of Action Subject to Mandatory Electronic Filing, Summons and Complaint pursuant to section 306 BCL together with statutory service fee in the amount of $40.00** to Sue Zouky as Business Document Specialist 2 of The New York State Department of State, 99 Washington Avenue, Albany, NY, 12207, the New York State Department of State being the **Registered Agent** of record of the within named corporation, in compliance with state statutes.


Said documents were conformed with index number and date of filing was endorsed thereon.

**Description** of Person Served:  Age: 61,  Sex: F,  Race/Skin Color: White,  Height: 5'4",  Weight: 150,  Hair: Brown, Glasses: N

I am over the age of 18 and have no interest in the above action.


Subscribed and Sworn to before me on the 27th day
of April, 2015  by the affiant who is personally known
to me.

_____

NOTARY PUBLIC
PATRICIA A. BURKE
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BU4922372
Qualified in Albany County
My Commission Expires February 28, 2018

**R. R. Ricchiuti**
Process Server

**Capital Process Servers, Inc.**
**265 Post Avenue  Suite 150**
**Westbury, NY  11590**
**(516) 333-6380**

Our Job Serial Number: 2015000993
Ref: 1084406

Copyright © 1992-2009 Database Services, Inc. - Process Server's Toolbox V6.3x

## AFFIDAVIT OF SERVICE

State of New York                          County of Kings                          Supreme Court

Index Number: 504469/2015
Date Filed: 4/15/2015

Plaintiff:
**XYZ Two Way Radio Service, Inc. and Elite Limousine Plus, Inc.**
vs.
Defendant:
**Uber Technologies, Inc., et al.**

**State of New York, County of Albany)ss.:**

Received by Capital Process Servers, Inc. to be served on **Weiter, LLC.**

I, R. R. Ricchiuti, being duly sworn, depose and say that on the **24th day of April, 2015** at **2:10 pm, I:**

Served the within named **LIMITED LIABILITY COMPANY, Weiter, LLC,** by delivering two true copies of the **Notice of Commencement of Action Subject to Mandatory Electronic Filing, Summons and Complaint pursuant to section 303 LLCL together with statutory service fee in the amount of $40.00** to Sue Zouky as Business Document Specialist 2 of The New York State Department of State, 99 Washington Avenue, Albany, NY 12207, the New York State Department of State being the **Registered Agent** of record of the within named limited liability company, in compliance with state statutes.

Said documents were conformed with index number and date of filing was endorsed thereon.

**Description** of Person Served:  Age: 61,  Sex: F,  Race/Skin Color: White,  Height: 5'4",  Weight: 150,  Hair: Brown, Glasses. N

I am over the age of 18 and have no interest in the above action.

Subscribed and Sworn to before me on the 27th day
of April, 2015, by the affiant who is personally known
to me.

_____
NOTARY PUBLIC

PATRICIA A. BURKE
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BU4922372
Qualified In Albany County
My Commission Expires February 28, 2015

R. R. Ricchiuti
Process Server

**Capital Process Servers, Inc.**
**265 Post Avenue  Suite 150**
**Westbury, NY  11590**
**(516) 333-6380**

Our Job Serial Number: 2015000994
Ref: 1084465

Copyright © 1992-2009 Database Services, Inc. - Process Server's Toolbox V6.3x

## AFFIDAVIT OF SERVICE

State of New York                    County of Kings                              Supreme Court

Index Number: 504469/2015
Date Filed: 4/15/2015

Plaintiff:
**XYZ Two Way Radio Service, Inc. and Elite Limousine Plus, Inc.**

vs.

Defendant:
**Uber Technologies, Inc., et al.**

**State of New York, County of Albany)ss.:**

Received by Capital Process Servers, Inc. to be served on **Hinter, LLC.**

I, R. R. Ricchiuti, being duly sworn, depose and say that on the **24th day of April, 2015** at **2:10 pm**, I:

Served the within named **LIMITED LIABILITY COMPANY, Hinter, LLC,** by delivering two true copies of the **Notice of Commencement of Action Subject to Mandatory Electronic Filing, Summons and Complaint pursuant to section 303 LLCL together with statutory service fee in the amount of $40.00** to Sue Zouky as Business Document Specialist 2 of The New York State Department of State, 99 Washington Avenue, Albany, NY 12207,  the New York State Department of State being the **Registered Agent** of record of the within named limited liability company, in compliance with state statutes.

Said documents were conformed with index number and date of filing was endorsed thereon.

**Description** of Person Served:  Age: 61,  Sex: F,  Race/Skin Color: White,  Height: 5'4",  Weight: 150,  Hair: Brown, Glasses: N

I am over the age of 18 and have no interest in the above action.

Subscribed and Sworn to before me on the 27th day
of April, 2018  by the affiant who is personally known
to me.

_____

NOTARY PUBLIC

PATRICIA A. BURKE
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BU4922372
Qualified In Albany County
My Commission Expires February 28, 2018

R. R. Ricchiuti
Process Server

**Capital Process Servers, Inc.**
**265 Post Avenue  Suite 150**
**Westbury, NY  11590**
**(516) 333-6380**

Our Job Serial Number: 2015000995
Ref: 1084466

Copyright © 1992-2009 Database Services, Inc. - Process Server's Toolbox V6.3x

## AFFIDAVIT OF SERVICE

State of New York                         County of Kings                         Supreme Court

Index Number: 504469/2015
Date Filed: 4/15/2015

Plaintiff:
**XYZ Two Way Radio Service, Inc. and Elite Limousine Plus, Inc.**
vs.
Defendant:
**Uber Technologies, Inc., et al.**

**State of New York, County of Albany)ss.:**

Received by Capital Process Servers, Inc. to be served on **Grun, LLC.**

I, R. R. Ricchiuti, being duly sworn, depose and say that on the **24th day of April, 2015** at **2:10 pm, I:**

Served the within named **LIMITED LIABILITY COMPANY, Grun, LLC,** by delivering two true copies of the **Notice of Commencement of Action Subject to Mandatory Electronic Filing, Summons and Complaint pursuant to section 303 LLCL together with statutory service fee in the amount of $40.00** to Sue Zouky as Business Document Specialist 2 of The New York State Department of State, 99 Washington Avenue, Albany, NY 12207, the New York State Department of State being the **Registered Agent** of record of the within named limited liability company, in compliance with state statutes.

Said documents were conformed with index number and date of filing was endorsed thereon.

**Description** of Person Served:  Age: 61,  Sex: F,  Race/Skin Color: White,  Height: 5'4",  Weight: 150,  Hair: Brown, Glasses: N

I am over the age of 18 and have no interest in the above action.

Subscribed and Sworn to before me on the 27th day
of April, 2015  by the affiant who is personally known
to me

_____
NOTARY PUBLIC  PATRICIA A. BURKE
               NOTARY PUBLIC-STATE OF NEW YORK
               No. 01BU4922372
               Qualified In Albany County
               My Commission Expires February 28, 2018

_____
R. R. Ricchiuti
Process Server

**Capital Process Servers, Inc.**
**265 Post Avenue  Suite 150**
**Westbury, NY  11590**
**(516) 333-6380**

Our Job Serial Number: 2015000996
Ref: 1084467

Copyright © 1992-2009 Database Services, Inc. - Process Server's Toolbox V6.3x

# AFFIDAVIT OF SERVICE

State of New York                              County of Kings                              Supreme Court

Index Number: 504469/2015
Date Filed: 4/15/2015

Plaintiff:
**XYZ Two Way Radio Service, Inc. and Elite Limousine Plus, Inc.**
vs.
Defendant:
**Uber Technologies, Inc., et al.**

**State of New York, County of Albany)ss.:**

Received by Capital Process Servers, Inc. to be served on **Unter, LLC.**

I, R. R. Ricchiuti, being duly sworn, depose and say that on the **24th day of April, 2015** at **2:10 pm**, I:

Served the within named **LIMITED LIABILITY COMPANY, Unter, LLC**, by delivering two true copies of the **Notice of Commencement of Action Subject to Mandatory Electronic Filing, Summons and Complaint pursuant to section 303 LLCL together with statutory service fee in the amount of** $40.00 to Sue Zouky as Business Document Specialist 2 of The New York State Department of State, 99 Washington Avenue, Albany, NY 12207, the New York State Department of State being the **Registered Agent** of record of the within named limited liability company, in compliance with state statutes.

Said documents were conformed with index number and date of filing was endorsed thereon.

**Description** of Person Served:  Age: 61,  Sex: F,  Race/Skin Color: White,  Height: 5'4",  Weight: 150,  Hair: Brown, Glasses: N

I am over the age of 18 and have no interest in the above action.

Subscribed and Sworn to before me on the 27th day
of April, 2015  by the affiant who is personally known
to me.

_____
NOTARY PUBLIC

PATRICIA A. BURKE
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BU4922372
Qualified In Albany County
My Commission Expires February 28, 2018

R. R. Ricchiuti
Process Server

**Capital Process Servers, Inc.**
**265 Post Avenue  Suite 150**
**Westbury, NY  11590**
**(516) 333-6380**

Our Job Serial Number: 2015000997
Ref: 1084468

Copyright © 1992-2009 Database Services, Inc. - Process Server's Toolbox V6.3x

## AFFIDAVIT OF SERVICE

**State of New York**                    **County of Kings**                    **Supreme Court**

Index Number: 504469/2015
Date Filed: 4/15/2015

Plaintiff:
**XYZ Two Way Radio Service, Inc. and Elite Limousine Plus, Inc.**
vs.
Defendant:
**Uber Technologies, Inc., et al.**

**State of New York, County of Albany)ss.:**

Received by Capital Process Servers, Inc. to be served on **Schmecken, LLC.**

I, R. R. Ricchiuti, being duly sworn, depose and say that on the **24th day of April, 2015** at **2:10 pm**, I:

Served the within named **LIMITED LIABILITY COMPANY, Schmecken, LLC,** by delivering two true copies of the **Notice of Commencement of Action Subject to Mandatory Electronic Filing, Summons and Complaint pursuant to section 303 LLCL together with statutory service fee in the amount of $**40.00 to Sue Zouky as Business Document Specialist 2 of The New York State Department of State, 99 Washington Avenue, Albany, NY 12207, the New York State Department of State being the **Registered Agent** of record of the within named limited liability company, in compliance with state statutes.

Said documents were conformed with index number and date of filing was endorsed thereon.

**Description** of Person Served:  Age: 61,  Sex: F,  Race/Skin Color: White,  Height: 5'4",  Weight: 150,  Hair: Brown,  Glasses: N

I am over the age of 18 and have no interest in the above action.

Subscribed and Sworn to before me on the 27th day of April, 2015  by the affiant who is personally known to me.

_____
NOTARY PUBLIC

PATRICIA A. BURKE
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BU4922372
Qualified in Albany County
My Commission Expires February 28, 2018

_____
R. R. Ricchiuti
Process Server

**Capital Process Servers, Inc.**
265 Post Avenue  Suite 150
Westbury, NY  11590
(516) 333-6380

Our Job Serial Number: 2015000998
Ref: 1084469

Copyright © 1992-2009 Database Services, Inc. - Process Server's Toolbox V6.3x

## AFFIDAVIT OF SERVICE

State of New York                              County of Kings                              Supreme Court

Index Number: 504469/2015
Date Filed: 4/15/2015

Plaintiff:
**XYZ Two Way Radio Service, Inc. and Elite Limousine Plus, Inc.**
vs.
Defendant:
**Uber Technologies, Inc., et al.**

**State of New York, County of Albany)ss.:**

Received by Capital Process Servers, Inc. to be served on **Danach-NY, LLC**.

I, R. R. Ricchiuti, being duly sworn, depose and say that on the **24th day of April, 2015** at 2:10 pm, I:

Served the within named **LIMITED LIABILITY COMPANY, Danach-NY, LLC,** by delivering two true copies of the **Notice of Commencement of Action Subject to Mandatory Electronic Filing, Summons and Complaint pursuant to section 303 LLCL together with statutory service fee in the amount of $40.00** to Sue Zouky as Business Document Specialist 2 of The New York State Department of State, 99 Washington Avenue, Albany, NY 12207, the New York State Department of State being the **Registered Agent** of record of the within named limited liability company, in compliance with state statutes.

Said documents were conformed with index number and date of filing was endorsed thereon.

**Description** of Person Served:  Age: 61,  Sex: F,  Race/Skin Color: White,  Height: 5'4",  Weight: 150,  Hair: Brown, Glasses: N

I am over the age of 18 and have no interest in the above action.

Subscribed and Sworn to before me on the 27th day
of April, 2015  by the affiant who is personally known
to me.

_____
NOTARY PUBLIC

PATRICIA A. BURKE
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BU4922372
Qualified in Albany County
My Commission Expires February 28, 2018

_____
R. R. Ricchiuti
Process Server

**Capital Process Servers, Inc.**
**265 Post Avenue  Suite 150**
**Westbury, NY  11590**
**(516) 333-6380**

Our Job Serial Number: 2015000999
Ref: 1084470

Copyright © 1992-2009 Database Services, Inc. - Process Server's Toolbox V6.3x