UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------x
XYZ TWO WAY RADIO SERVICE,
INC. and ELITE LIMOUSINE PLUS,
INC.,

                Plaintiffs,

      -against-                     **MEMORANDUM AND ORDER**
                                              15-cv-3015 (FB) (CLP)

UBER TECHNOLOGIES, INC.,
WEITER, LLC, HINTER, LLC,
GRUN, LLC, UNTER, LLC,
SCHMECKEN, LLC, and DANACH-
NY, LLC,

                Defendants.
----------------------------------------------x

*Appearances*
*For the Plaintiff:*                      *For the Defendant:*
LISA S. SOLBAKKEN, ESQ.          JOSHUA A. BERMAN, ESQ.
ROBERT C. ANGELILLO, ESQ.      SUSAN GRACE, ESQ.
DEANA DAVIDIAN, ESQ.             Troutman Sanders, LLP
Arkin Solbakken LLP                  875 Third Avenue
750 Lexington Avenue, 25th Floor    New York, New York 10022
New York, New York 10022

**BLOCK, Senior District Judge:**

      Uber Technologies, Inc. ("Uber"), entered the New York City ground

transportation market in May 2011. *See* Jenna Wortham, *With a Start-Up Company,*

*a Ride Is Just a Tap of an App Away*, N.Y. Times, May 4, 2011, at B6. Since then, its

fierce competition with the city's yellow cabs and black cars has generated a firestorm

of political and legal controversy. *See, e.g.*, Matt Flegenheimer, *Its Legality Uncertain, App to Hail Taxis in City Is Halted After 6 Weeks*, N.Y. Times, Oct. 17, 2012, at A24; Rebecca Harshbarger, *City Gets Uber Hand, Shuts 5 bases as upstart firm shields data*, N.Y. Post (Jan. 7, 2015), at 10; Dan Rivoli, *Illegal hails see Uber rise*, N.Y. Daily News, Apr. 7, 2016, at 2; *Glyca Trans LLC v. City of New York*, 2015 N.Y. Slip Op. 31703(U) (Sup. Ct., Queens County, Sept. 8, 2015) (rejecting taxi and black-car drivers' challenge to Taxi and Limousine Commission's "e-hail" regulations).

In this action, two black-car companies—XYZ Two Way Radio Service, Inc. ("XYZ"), and Elite Limousine Plus, Inc. ("Elite")—claim that certain statements by Uber constitute false advertising in violation of the federal Lanham Act, 15 U.S.C. § 1125, and the New York General Business Law. They further allege that Uber violates both of those statutes by falsely implying that they are affiliated with or endorse Uber. Finally, they argue that Uber has tortiously interfered with the contractual and business relationships between them and their drivers.

Uber moves to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motion is granted.

## DISCUSSION

The facts relevant to each of the plaintiffs' claims are incorporated into the discussion of that claim. They are drawn from the complaint and taken as true, with

2

all inferences drawn in the plaintiffs' favor.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

## A.  False Advertising

The Lanham Act prohibits any material "false or misleading representation of fact" in connection with commercial advertising or promotion.   15 U.S.C. § 1125(a)(1)(B).  If a statement does not qualify as false advertising under the Lanham Act, it is not actionable under the General Business Law, either.  *See ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 (2d Cir. 2013) ("There is . . . no reason to believe that the New York Court of Appeals would interpret state law to provide for more expansive liability than does the Lanham Act.").

"A claim of false advertising may be based on at least one of two theories: 'that the challenged advertisement is literally false, i.e., false on its face,' or 'that the advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers.'" *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 112 (2d Cir. 2010) (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir.2007)). "Under either theory, the plaintiff must also demonstrate that the false or misleading representation involved an inherent or material quality of the product." *Time Warner Cable*, 497 F.3d at 153 n.3.

Central to a proper understanding of the plaintiffs' false advertising claims is the concept of "puffery."  The Second Circuit "has had little occasion to explore the

concept of puffery in the false advertising context." *Time Warner Cable*, 497 F.3d at 159.  In *Lipton v. Nature Co.*, 71 F.3d 464 (2d Cir. 1995), it characterized a claim of "thorough research" as "puffing," and explained that "[s]ubjective claims about products, which cannot be proven either true or false, are not actionable under the Lanham Act." *Id.* at 474 (citation and internal quotation marks omitted).  In *Time Warner Cable*, however, the circuit court recognized that *Lipton*'s definition was not exclusive, and cited other definitions approvingly.  *See* 497 F.3d at 159.  In particular, it cited *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939 (3d Cir. 1993), in which the Third Circuit described puffery as "an exaggeration or overstatement expressed in broad, vague, and commendatory language," and explained that it is not actionable as false advertising because it is "understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer."  *Id.* (citation and internal quotation marks omitted).  In addition, the Second Circuit cited *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489 (5th Cir. 2000):

> [W]e think that non-actionable "puffery" comes in at least two possible forms: (1) an exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying; or (2) a general claim of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion.

*Id.* at 497.

4

The plaintiffs offer two categories of statements they claim are false or misleading. The first category pertains to Uber's statements regarding safety, the second to the relationship between Uber and drivers. The Court analyzes each in turn.

## 1.  Safety

According to the complaint, the following statements appear on Uber's website, either directly or in the form of links to blog posts:

- Wherever you are around the world, Uber is committed to connecting you to the safest ride on the road. This means setting the strictest safety standards possible, then working hard to improve them every day. The specifics vary depending on what local governments allow, but with each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security—and what we're doing in the US is an example of our standards around the world. Compl. ¶¶ 40-41.

- From the moment you request a ride to the moment you arrive, the Uber experience has been designed from the ground up with your safety in mind. *Id.* ¶ 42.

- We believe deeply that, alongside our driver partners, we have built the safest transportation option in 260 around the world. . . . Of course, no background check can predict future behavior and no technology can yet fully prevent bad actions. But our responsibility is to leverage every smart tool at our disposal to set the highest standard in safety we can. We will not shy away from this task. *Id.* ¶¶ 43, 49.

- BACKGROUND SAFETY CHECKS YOU CAN TRUST. Every ridesharing and livery driver is thoroughly screened through a rigorous process we've developed using industry-leading[1] standards. This includes a three-step criminal background screening for the U.S.—with county, federal and multi-

---

[1]"Industry-leading" was used until the end of October 2014, at which time the phrase was replaced by "constantly improving." Compl. ¶ 46.

state checks that go back as far as the law allows—and ongoing reviews of drivers' motor vehicle records throughout their time on Uber. *Id.* ¶¶ 45-46.

- All Uber ridesharing and livery partners must go through a rigorous background check that leads the industry.[2] . . . Screening for safe drivers is just the beginning of our safety efforts.  Our process includes prospective and regular checks of drivers' motor vehicle records to ensure ongoing safe driving. Unlike the taxi industry, our background checking process and standards are consistent across the United States and often more rigorous than what is required to become a taxi driver. . . . Uber works hard to ensure that we are connecting riders with the safest rides on the road.  The current efforts we are undertaking to protect riders, drivers and cities are just the beginning. We'll continue innovating, refining, and working diligently to ensure we're doing everything we can to make Uber the safest experience on the road.  *Id.* ¶¶ 47-48.

- Drivers not only meet Uber's standards, they meet your standards. . . . At Uber, riders rate their experience at the end of every trip, and drivers do the same. Uber regularly reviews that feedback and, through this process, we're able to create and maintain a safe and respectful environment for riders. . . . Real-time feedback about drivers means Uber can correct for issues big and small—while ensuring that only the best drivers stay on the road.  We take this feedback seriously—depending on the circumstances, rider feedback may lead to deactivating a partner from the system.  *Id.* ¶¶ 63, 65.

No doubt, these statements are intended to convey the impression that Uber takes the safety of its passengers seriously.  But they do so in terms that clearly fall within one or more of the accepted definitions of puffery.  The overall tone is boastful and self-congratulatory.   Many of the statements are couched in aspirational terms—"committed to," "aim to," "believe deeply"—that cannot be provenr true or

---

[2]Uber removed "that leads the industry" sometime in December 2014.  *See* Compl. ¶ 47.

false.  *Cf. City of Pontiac Policemen's & Firemen's Retirement Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (statements qualified with terms such as "aims to," "wants to," and "should" not actionable as securities fraud).  Others are vague and hyperbolic; if Uber literally set the "strictest safety standards possible" at the outset, it could not "improve them every day."  In sum, the Court concludes that the challenged statements cannot reasonably be understood as specific representations of objective facts.

Perhaps recognizing this, the plaintiffs have focused in their memorandum of law and at oral argument on what they describe as the centerpiece of Uber's customer-safety sales pitch: the background check.  According to the plaintiffs, Uber's background check is not "more rigorous than what is required to become a taxi driver," Compl. ¶ 47, because it does not require fingerprints, a medical clearance or a drug test, all of which New York City's Taxi and Limousine Commission ("TLC") requires for both yellow-cab and black-car drivers.  However, the Court concludes that the statement is not false or misleading.

In the first place, the statement is qualified.  Uber represents only that its background checks are "*often* more rigorous  than what is required to become a taxi driver." *Id.* (emphasis added).  Moreover, the statement refers to the basic background check that Uber conducts on all drivers in the United States.  Its website acknowledges that "[t]he specifics vary depending on what local governments allow," *Id.* ¶ 41.  It

7

then makes a specific representation with respect to New York City: "In New York City, DMV and criminal background checks are conducted by the Taxi and Limousine Commission (TLC) according to their licensing standards." Decl. of Joshua A. Berman, Ex. D.

The complaint excludes this proviso. But "[e]ven where a document is not incorporated by reference [into the complaint], the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers*, 282 F.3d at 153 (quoting *International Audiotext Network, Inc. v. American Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)). In *Chambers*, for example, the circuit court approved consideration of recording contracts in connection with a motion to dismiss copyright infringement claims. *See id.*; *see also International Audiotext*, 62 F.3d at 72 (deeming contract integral to claim that contract violated Sherman Act).

The complaint clearly "relies heavily," *International Audiotext*, 62 F.3d at 72; on Uber's website; indeed, the false advertising claims are based exclusively on statements from the website. *See* Compl. ¶¶ 39-87. It is only fair to consider those statements in their entirety.

The plaintiffs argue that drivers for Uber's lower-cost UberX service do not have to have a commercial driver's license, thus implying that they are not subject to TLC's licensing process. They cite statements on Uber's website that "[n]o special

8

drivers license [is] required," Decl. of Robert C. Angelillo, Exs. B & C, but those statements refer to the requirements in Connecticut and New Jersey, respectively. There is no allegation contesting the website page that states—without qualification—that "[i]n order to drive with Uber in New York City, you need a TLC (Taxi and Limousine Commission) License." Berman Decl., Ex. B. Indeed, the pages cited by the plaintiffs explicitly warn that Connecticut and New Jersey Drivers "CANNOT pick up anywhere in New York State." Angelillo Decl., Exs. B & C; *see also id.* ("You can drop off in NY, but would have to return to CT or NJ to pick up your next rider.").

In sum, the Court holds that Uber's description of its background checks is not false or misleading, and that the balance of the challenged statements are non-actionable puffery.

## 2. Relationship with Drivers

The second aspect of the plaintiffs' false advertising claim is based on various statements on Uber's website referring to drivers as "partners." Compl. ¶¶ 70-71. Some of these statements—for example, "[w]hen you partner with Uber, we've got your back," *id.* ¶ 70—are plainly directed at potential drivers, not customers. However, the plaintiffs allege that Uber's terminology "entice[s] both passengers and drivers to join their service by falsely claiming that there is a partnership between [Uber] and [its] drivers." *Id.*   They claim that this is deceptive because Uber

9

considers its drivers independent contractors and expressly disclaims liability for their actions.

The plaintiffs' claims starts from the premise that customers take "partners" as a legal term of art, namely, individuals legally liable for each other's acts. *See, e.g.*, *In re Peck*, 206 N.Y. 55, 62 (1912) ("It is established by repeated decisions in this state that a tort for which the partnership is liable makes every member of the firm severally individually liable."). But nothing in the statements themselves suggests that meaning, and the complaint does not allege any facts to support an inference that customers understand the term that way. Indeed, the term "partner," as used on Uber's website, reads like euphemistic adspeak devoid of any inherent meaning. *Accord Greenwich Taxi, Inc. v. Uber Techs., Inc.*, 123 F. Supp. 3d 327, 336 (D. Conn. 2015) ("[E]ven accepting [the] allegations in the amended complaint as true, the plaintiffs have not pleaded, nor can it reasonably be inferred, what it means to be an Uber 'partner' and why the representation is false or misleading.").

## B.  False Association

In addition to false advertising, the Lanham Act prohibits the use of another's trademark in a way that deceptively claims "affiliation, connection, or association." 15 U.S.C. § 1125(a)(1)(A). In addition to such deception, the plaintiff must establish that "(1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) in connection with the sale

or advertising of goods or services, (5), without the plaintiff's consent." *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 406-07 (2d Cir. 2005) (internal quotation marks, citation and alteration omitted).

The plaintiffs' theory of false association is that some of their drivers have signed up as Uber "partners," and use plaintiffs' cars for Uber pickups. Those cars bear service marks belonging to the plaintiffs. Thus, the plaintiffs allege, when a car arrives bearing both Uber's logo and one of their service marks, the consumer is deceived into thinking that Uber is associated with, or endorsed by, the plaintiffs.

Uber challenges the plaintiffs' theory on several grounds, but the Court need address only one. When a driver employed by one of the plaintiffs decides to make an Uber pickup in a  car bearing one of the plaintiffs' services marks, it is the driver—not Uber—who is "using" the mark.

## C.  Tortious Interference

The plaintiffs' final claim alleges tortious interference with contractual and business relations, which the Court interprets to include tortious interference with contract and tortious interference with business relations. The plaintiffs argue that Uber interferes with both by inducing their drivers to violate the terms of their employment, including, *inter alia*, promises not to work for competing transportation companies and to obey all applicable laws and regulations.

11

Uber argues that the plaintiffs' agreements with their drivers are at-will contracts and, therefore, cannot support a claim for tortious interference with contract. *See Miller v. Mount Sinai Med. Ctr.*, 733 N.Y.S.2d 26, 27 (1st Dep't 2001) (citing *Guard-Life Corp. v. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 193 (1980)). The plaintiffs argue that there are limits on their ability to terminate drivers, and seek leave to amend to allege them. Such an amendment would be futile, however, since the plaintiffs do not claim any limits on a *driver's* ability to quit. A contract remains at-will from the employee's perspective even if the employer's right to terminate is not absolute. *Cf. Gorrill v. Icelandair/ Flugleidir*, 761 F.2d 847, 852 (2d Cir. 1985) (citing *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 464 (1982), as "[r]ejecting the proposition that an employee's freedom to quit his employment at will is conclusive of whether, as a matter of mutuality, an employer could, in turn, terminate at will").

At-will contracts can support a claim for tortious interference with business relations. *See Waste Serv., Inc. v. Jamaica Ash & Rubbish Removal Co.*, 691 N.Y.S.2d 150, 151 (2d Dep't 1999) ("Agreements that are terminable at will are classified as prospective contractual relations[.]"). But unlike tortious interference with contract, tortious interference with business relations "requires a showing of malice or wrongful conduct." *Id.*; *see also NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp.*, 87 N.Y.2d 614, 621 (1996) ("Where there has been no breach of an existing

contract, but only interference with prospective contract rights, however, plaintiff must show more culpable conduct on the part of the defendant.").

In this context, wrongful conduct includes fraud, threats, and breach of fiduciary duty. *See Guard-Life Corp.*, 50 N.Y.2d at 194. In short, "as a general rule, the defendant's conduct must amount to a crime or an independent tort." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004). Moreover, "conduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." *Id.* at 192. Thus, the plaintiffs must allege that Uber directed tortious or criminal conduct at their drivers.

The allegations of the complaint on that point are vague. To the extent that the plaintiffs claim that Uber enticed drivers with monetary and other benefits, New York law is clear that "persuasion and offer[s] of better terms" are not wrongful. *Guard-Life Corp.*, 50 N.Y.2d at 196. The plaintiffs refer to the same statements that underlie their false advertising claims, as well as to the same "use" of their service marks that underlies their false association claim, but, as explained above, there is no actionable false advertising or false association.

## CONCLUSION

The plaintiffs have every right to demand that the competition they face from Uber be fair. However, for the reasons set forth above, the Court concludes that they

have failed to allege that Uber made any statements that constitute false advertising, that Uber used their service marks, or that Uber tortiously interfered with the contractual or other business relationships between them and their drivers. Accordingly, Uber's motion to dismiss is granted and the complaint is dismissed.

**SO ORDERED.**

/S/Frederic Block  
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
September 30, 2016

14